490 A.2d 278

**Joe Bill ROWE**

v.

**STATE of Maryland.**

**No. 954, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

April 9, 1985.

488

Michael R. Braudes, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on the brief), for appellant.

Valerie J. Smith, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, Warren B. Duckett, Jr., State's Atty. for Anne Arundel County and Gerald K. Anders, Asst. State's Atty. for Anne Arundel County, Annapolis, on the brief), for appellee.

Submitted before ADKINS, ALPERT and KARWACKI, JJ.

ALPERT, Judge.

A contract murder brought us this appeal. Joe Bill Rowe, appellant, ardently contends that he was not the hired gun. Prosecutors in Anne Arundel County convinced

a jury otherwise, for on March 30, 1984, Rowe was convicted of two counts of first degree murder and was subsequently sentenced to two consecutive terms of life imprisonment.

This appeal followed, and appellant assigns a pentad of errors. He claims that the trial court erred in:

1. Restricting the cross-examination of a prosecution witness;

2. Refusing to apprise the State's principal witness of his privilege against self-incrimination;

3. Sustaining the State's objection to the question of whether or not any physical evidence linked appellant to the scene of the crime;

4. Excluding evidence that the State's principal witness had offered to kill the wife of a defense witness; and

5. Excluding evidence indicating that the State's principal witness was the actual perpetrator of the offense.

Perceiving no error, we shall affirm.

### FACTS

On December 21, 1981, John and Donna Carback were brutally murdered. John met his death by a gunshot wound to the head; Donna died as the result of multiple gunshot and stab wounds. An investigation by the Anne Arundel County Police Department resulted in the indictment of Joe Bill Rowe for those murders.

At trial in the Circuit Court for Anne Arundel County, the State's star witness, and a potential co-conspirator, was one Wade Lane. Lane testified that in the late summer or early fall of 1981, an old acquaintance, one Larry Bratt,[1] contacted him in Texas where he, Lane, was working in the oil fields. As a result of that contact, a meeting was set up between the two in Atlanta, Georgia. At the meeting in Atlanta, Bratt told Lane that there were two people in

---

1. Bratt and Lane became acquainted at a school for counter-terrorists specializing in a variety of subjects including wilderness survival.

Maryland that Bratt wanted "taken out" (killed). Thinking that Bratt was joking, Lane declined. Apparently, Bratt was not joking; he persisted in his request, and asked Lane to put him in touch with someone who would be willing to perform a murder for hire.

Upon returning to Texas and resuming his oil field employment at the Wagner Manufacturing Company, Lane engaged in a conversation with Rowe and, according to Lane, Rowe expressed a willingness to act as the "hit man." Lane then put Rowe in touch with Bratt.

Under a grant of immunity, Lane further testified that on December 18, 1981, he had travelled to Maryland for the purpose of modifying an Ingram submachine gun for Bratt by transforming it from semi-automatic to fully automatic. The following day he and Bratt met Rowe at the Baltimore-Washington International Airport and drove to Bratt's apartment, where they met one Tommy Raspa. According to Lane, Bratt, Raspa and appellant, while at the apartment, planned the surreptitious entry by Raspa and Rowe into the Carbacks' residence. They planned to tell the Carbacks, who allegedly were major narcotics dealers, that Bratt "was getting out of the dope business and Raspa was going to introduce him to his supplier" who was supposed to be none other than Rowe. According to Lane, Bratt and his girlfriend left for dinner while Raspa and appellant put some items in a bag (the Ingram, a bag of white powder and a mirror) and left. Bratt returned from dinner alone. Shortly thereafter, Rowe returned with Raspa. Rowe, at that time, was injured; the end of one of his fingers above the "knuckle joint" (interphalangeal joint) was missing. Lane then attempted to bandage the finger while Bratt and Raspa returned to the Carbacks, apparently to pick up some drugs that were left at the Carback residence. When Bratt returned with Raspa, Bratt had a towel with blood on it and a knife in it, which he shoved up to Lane's face and said, "My man here [Raspa] had to finish her with this knife."

Lane travelled to Atlanta with Rowe and Raspa. They stopped at a river on the way and threw two handguns into the river. Rowe allegedly told Lane that during the murder Donna Carback started screaming so he put his hand over her mouth and Raspa shot him in the finger.

Lane's testimony was corroborated by one witness who selected appellant's photograph as the likeness of a person seen with Bratt and Lane in Maryland on Saturday, December 19.

Lane's testimony regarding Rowe's arrival in Georgia on December 20th was also corroborated. Friends of Lane's, the Reeders, testified that Mrs. Reeder picked up Lane and Rowe at a bus station which services an airport shuttle. Mr. Reeder testified that when Lane and appellant arrived at his house, he attempted to clean Rowe's wound and that Lane and Rowe stayed with him and his wife the night of the 20th. Mrs. Reeder also testified that on the 21st she took Lane home and dropped Rowe off at the same bus station where she had picked him up on the previous day.

Rowe's doctor testified that he examined Rowe's hand on December 22nd at his office in Odessa, Texas; at the time it was treated, the wound was "from 24 to maybe about 48 hours old." Hospital records, introduced at trial, indicated that appellant was admitted in connection with this injury on the afternoon of December 22nd.

Finally, the State presented evidence tending to show that Rowe may not have been at work on December 19th. The records, although indicating that Rowe had worked that day, were written by someone other than appellant. Mrs. Rowe, appellant's wife, admitted to filling out appellant's work record for that day and testified on cross-examination that it was the first time she had ever filled them out for appellant.

During appellant's case-in-chief, appellant testified that he was in Odessa, Texas the weekend of December 19th and 20th and that he hurt his hand on the 20th when a gun he was carrying accidentally discharged. He further testified

that he did not seek medical attention then because of an upcoming custody matter in which his present wife was involved. His testimony was corroborated by a friend, Roger Davidson, and his wife, Rose Rowe, both of whom testified to seeing appellant in Texas on December 19th and 20th.

## I.

Rowe contends that the court erred in not allowing him to show the "bias" of Detective Sergeant William A. Tankersley. He argues that "Detective Sergeant William A. Tankersley was among the principal investigating officers in the case, and the conduct and content of his interviews with Appellant's alibi witnesses became a major subject of controversy."

Detective Tankersley testified twice during the course of the trial. He testified during the State's case-in-chief and as a rebuttal witness. Rowe's sole defense in this case has been that he was not involved in the Carback murders and could not have been involved because he was in Odessa, Texas the weekend of December 19th and 20th. The purpose of Detective Tankersley's testimony as a rebuttal witness was to impeach the credibility of Rowe's witnesses. When compared, there are several discrepancies between Tankersley's testimony and the testimony of defense witnesses, Rowe's wife and Roger Davidson.

During Rowe's case-in-chief, Mrs. Rowe testified that on December 19, 1981, she went to see Rowe at work and then drove to her sister-in-law's. She saw appellant again when she returned home Sunday, December 20th. Appellant, at that time, had his finger wrapped in gauze; she did not, however, ask him how he was injured. Mrs. Rowe testified that she knew she returned on Sunday because she was to go to court the following Tuesday in connection with a custody matter.

Detective Tankersley, on the other hand, testified on rebuttal that when he interviewed Mrs. Rowe in March,

1984, she stated she did not ask appellant about his hand because "she did not care to know." According to the detective, Mrs. Rowe also stated that the reason she remembered seeing appellant on Sunday, December 20th, was that she had to get her children ready for school the following day. The detective also testified that when he confronted Mrs. Rowe with the fact that there was no school because of Christmas vacation, she admitted that she may have been confused about her days but was nevertheless sure she saw appellant in Odessa on December 20th. Mrs. Rowe denied these statements when cross-examined.

One of appellant's other alibi witnesses, Roger Davidson, testified that he met with appellant while job hunting at appellant's place of employment on the two Saturdays before Christmas, 1981. He stated that he and appellant went drinking on the afternoon of December 19th and that when he next saw appellant on Sunday, December 20th, appellant had an injured hand.

Detective Tankersley, on the other hand, testified on rebuttal that when he interviewed Roger Davidson in March 1984 Davidson told him the same story. When the detective, however, pointed out that Davidson had not started working with appellant until December 29th, the detective noted that Davidson recanted and said that perhaps it was not until after Christmas that he went drinking with appellant. Roger Davidson denied these statements when cross-examined about them; according to him he told Tankersley that he saw appellant the two Saturdays before Christmas.

Given the apparent inconsistencies in the testimony, appellant, in an effort to lessen the impact of Tankersley's rebuttal testimony, attempted to impeach his credibility by attempting to elicit evidence of bias. Detective Tankersley was asked:

... policemen, you in particular, receive promotions for closing out major homicides?

The court sustained the prosecutor's objection. Next, Tankersley was asked:

Is it fair to say Detective Tankersley that you want this jury to convict Joe Bill Rowe?

Again, the prosecutor objected. The court again sustained the objection.

This was not reversible error. Our courts have long held that "a witness may be cross-examined 'on such matters and facts as are likely to affect his credibility, test his memory or knowledge, show his relation to the parties, or cause, his bias, or the like.'" *Cox v. State*, 298 Md. 173, 178, 468 A.2d 319 (1983) (quoting *Kantor v. Ash*, 215 Md. 285, 290, 137 A.2d 661 (1958)).

■ While "cross examination will not be permitted on matters that are irrelevant, or immaterial to the issue being tried," 298 Md. at 179, 468 A.2d 319, a witness's bias is always relevant in that it may affect the weight of his testimony. *See Cox*, 298 Md. at 180, 468 A.2d 319 ("where matter is purely collateral to issue at trial it should only be admitted if probative of a lack of credibility").

■ In the case *sub judice* the questions asked of the detective sought to elicit evidence of his bias. Evidence of bias is produced to impress upon a trier of facts that a witness's testimony should not be taken at face value, not because the witness is lying but rather because his bias or prejudice has colored his testimony. *See* Annot., 87 A.L. R.2d 407.

■ Admissibility of the subject questions was within the sound discretion of the trial court. Judge Charles E. Orth, speaking for a majority of this Court in *Cox v. State*, 51 Md.App. 271, 443 A.2d 607 (1982) said:

We are mindful of the general rule so often cited that the allowance or disallowance of questions on cross-examination is normally left to the sound discretion of the trial

judge. And we recognize that discretionary rulings by the trial court carry a presumption of validity.

51 Md.App. at 282, 443 A.2d 607 (citations omitted). We explored the limits of that discretion in an earlier case, *Fletcher v. State,* 50 Md.App. 349, 357, 437 A.2d 901 (1981):

> The determination of whether there has been an abuse of discretion necessarily requires consideration of the particular circumstances bearing upon each individual case. Clearly, the absolute preclusion of cross-examination pertaining to a witness's motive for testifying would be an abuse of discretion, but beyond that we must look to such factors as the scope of interrogation permitted, how relevant the particular inquiry is to bias or motive, and whether the defendant has been prejudiced by the court's ruling.

In *Reese v. State,* 54 Md.App. 281, 287, 458 A.2d 492 (1983), we further defined the boundaries of the trial judge's discretion in protecting a witness from humiliation or harassment during cross-examination.

> The 'discretion' then, between the defendant's right to discredit testimony and the trial judge's duty to protect a witness is solely one of relevance of the questions to the witness's credibility. *The relevancy test at this juncture does not regard the elucidation of one of the main issues at trial, it is whether the answer elicited will be a useful aid to the court or jury in appraising the credibility (not necessarily the veracity) of the witness and in assessing the probative value of his direct testimony.*

(Emphasis added).

Thus, as we evaluate the trial judge's exercise of discretion, we must examine the questions in the context of the answers to be elicited. Will the answers "be a useful aid to the court in appraising the credibility [bias] of the witness and in assessing the probative value of his direct testimony"? *Id.* at 287, 458 A.2d 492.

The teachings of the Court of Appeals in *Apple v. State,* 190 Md. 661, 59 A.2d 509 (1947), assist us in examining the exercise of discretion in the instant case. In *Apple* the Court found no error in refusing to allow cross-examination of a police officer. The officer was a witness to an assault for which the defendant was being tried. The assault allegedly occurred on a picket line. On cross-examination defense counsel asked the officer if Bethlehem Steel, the picketed employer, "was feeding the police, giving them sandwiches and coffee down on the picket line." *Id.* at 665, 59 A.2d 509. The question was not allowed and on appeal the Court found no error because

> [t]he question and the proffer were not directed to any food or drink received by the officer who was testifying, but were general in their nature, and could have had no special bearing on the credibility or bias of this particular officer. They were not in any way pertinent to the issue before the jury, and their only purpose could have been to create prejudice against the police force. The range of cross-examination is wide, but it cannot be extended beyond the pertinent issues in the case. It is and must be left largely to the discretion of the trial judge as to the latitude allowed, and unless there is clear error, (which we do not find in this case) the ruling of the lower court will not be disturbed.

As in *Apple,* the "promotion" question was general in nature, could have had no special bearing on the credibility or bias of the witness and seemingly was proposed to create prejudice against police in general. Policemen, we assume, like other employees, secure advancement through the performance of good work. There is nothing inherently inappropriate in that universally accepted practice. The question as articulated by defense counsel did not focus upon any specific personal bias on the part of Detective Tankersley which might have been motivated by a promise of promotion for closing out this particular case.

A "common thread" emerges from those cases wherein cross-examination to show bias is at issue: the cross-examination must be designed to elicit a specific *personal*[2] bias on the part of the witness.

In *Webb v. State*, 336 So.2d 416 (Fla.Dist.Ct.App.1976) the Court, in reversing a narcotics conviction, held that the lower court erred in improperly limiting the scope of cross-examination of a State's witness. The witness, a police officer, was asked about a conversation he had regarding the defendant's pending civil suit against the police chief for false arrest. The trial court sustained an objection to the question. That evidence, if believed, would tend to show that Webb was being "framed" because of the civil suit. In reversing the conviction, the court held that evidence of a witness's bias or prejudice was always relevant.

A question asked of a government informant in a prosecution for narcotics offenses, has to how much the informer had been paid by the government, was held to be highly relevant for purposes of cross-examination because of the informer's financial stake in the particular case. *Harris v. United States*, 371 F.2d 365 (9th Cir.1967). *See also Goodwin v. State*, 263 Ark. 856, 568 S.W.2d 3 (1978); *People v. Rice*, 103 Mich. 350, 61 N.W. 540 (1894); *State v. Wakeley*, 43 Mont. 427, 117 P. 95 (1911).

In *Heager v. State*, 181 Ind.App. 5, 390 N.E.2d 239 (1979) the Court of Appeals of Indiana found error in sustaining an objection to a question whether *the police officer*, in a drunk driving case, was "expected to make a certain number of arrests...." Although this question superficially may seem close to the "promotion" question herein, we observe that in *Heager* not only was the quota pressure

---

**2.** "*Bias*, in common acceptance, covers all variety of hostility or prejudice against the opponent *personally* or of favor to the proponent personally." *Wigmore on Evidence* (Testimonial Impeachment) § 945 (1970) (emphasis in original).

directed to *the* arresting officer but the entire state's case rested on the credibility of the officer.

■ The second question (whether Detective Tankersley wanted the jury to convict Rowe) was likewise general in nature and did not focus on any specific personal bias. There was no suggestion that Detective Tankersley had a *personal* stake in the outcome of the case or that he harbored some *personal* animus toward Rowe. Thus, we conclude that neither question posed to Detective Tankersley would be useful to the trier of fact in appraising his credibility or in assessing the probative value of his direct testimony. The trial judge did not abuse his discretion.

## II.

■ Next, appellant complains that the trial court erred when it refused to grant defense counsel's request that Lane be apprised of his privilege against self-incrimination. It is not necessary to devote much time or space to this issue. It is clear that the Fifth Amendment privilege against self-incrimination is a personal one which may only be invoked by the witness and his counsel. *Poling v. State,* 6 Md.App. 45, 47, 250 A.2d 126 (1968), *cert. denied,* 255 Md. 743 (1969). Even if a witness makes a claim of privilege and is improperly disallowed by the trial court, it is not reversible error on behalf of the defendant. *Hopkins v. State,* 5 Md.App. 284, 286, 246 A.2d 288 (1968). The trial court's ruling was correct.

## III.

■ In order to assess properly this third assignment of error, it is necessary to set out the controversial question in full.

Based upon your graduate Degree in Forensic Science, based upon your hands and knees search of that entire premises, based on the thirty or thirty-one exhibits, based upon your access to the F.B.I. Lab, your own test, all the scientific tests at your disposal, yes or no, is it fair to say

that there is not one piece of physical evidence that ties Joe Bill Rowe into that house?

The prosecutor's objection was sustained, and we believe properly so.

Appellant argues that "an absence of physical evidence at the crime scene, brought into focus by defense counsel's question, makes it less likely true that appellant was involved in the murders." If appellant had limited his question to whether any evidence *that Detective Barr found* linked the defendant to the scene of the crime, this argument would seem to have some merit. The question, however, was not so limited.

In stating, "there is not one piece of physical evidence that ties Joe Bill Rowe into that house ..." the question goes beyond the scope of what Detective Barr found within the house. It appears that within the hypothetical question, evidence of treatment in Georgia and Texas for a gunshot wound is not a fact which was included. The evidence relating to appellant's arrival in Georgia with an injured hand and the treatment he received there and in Texas, which was presented after the testimony of Detective Barr and Wade Lane, appears to tie him to the crime scene. Drops of blood found near the Carbacks' front door, along with the evidence of appellant's wound, create at least an inference that appellant was at the scene.

■ It is axiomatic that an expert witness may not render an opinion based on a hypothetical question unless all facts necessary to that opinion are included within the question. *See Stumpf v. State Farm Mutual Auto Insurance,* 252 Md. 696, 251 A.2d 362 (1968); *Finke v. State,* 56 Md.App. 450, 500–01, 468 A.2d 353 (1984).

## IV.

■ On cross-examination, Lane, when asked whether he participated in the execution-style murders, denied such

participation. Defense counsel proffered and sought to adduce evidence through Roger Davidson, a defense witness, that Lane had indicated to Davidson that he would be willing to kill Davidson's wife. Appellant contends, citing *State v. Cox*, 298 Md. 173, 468 A.2d 319 (1983), that Davidson's testimony would contradict Lane's denial that he was willing to engage in such activity and, therefore, was admissible. Rowe's reliance on *Cox* is misplaced for *Cox*, indeed, supports the trial judge's ruling that the proffered testimony was inadmissible.

In *Cox* the Court of Appeals held that in a prosecution which resulted in conviction of first degree rape, cross-examination seeking to establish that the prosecutrix was lying was proper because:

[c]ounsel's proffer indicated a proper line of cross-examination since the information to be extracted from the witness would relate to her character for veracity and thereby allow the fact-finder to assess her credibility.

*Id.* at 183, 468 A.2d 319.

There, counsel attempted to show that the prosecutrix had, on a prior occasion, sworn out a warrant charging another with criminal assault and later recanted that charge. The *Cox* line of cross-examination is at best analogous to appellant's cross-examination which resulted in a denial. As Lane denied the alleged "prior misconduct," defense counsel would be bound by his answer in that he could not introduce evidence to prove the discrediting act. *Id.* at 183, 468 A.2d 319. *See also Smith v. State*, 273 Md. 152, 157, 328 A.2d 274 (1974).

■ Viewed from a different perspective, the trial judge would not have erred had he refused to permit defense counsel to even question Lane about any alleged participation in any unrelated contract murders—an inherently collateral matter. The test for determining admissibility is whether the fact upon which the prior inconsistent state-

ment was predicated should have been shown in evidence for any purpose independent of the contradiction. We are unable to discern any other purpose which would authorize the admissibility of Lane's alleged willingness to murder Davidson's wife. Again, we agree with the ruling of the trial judge.

## V.

Lastly, appellant argues that in order to establish that Lane was an actual participant in the homicide, rather than the "very limited partner he admitted to being," he proffered evidence that during· the month that the crime occurred, Lane purchased a new welding tool worth between $3,000 and $4,000. He contends that the trial court committed reversible error by sustaining the prosecutor's objection on the ground of relevance, and asserts "if Lane had come into a substantial amount of money during the precise timeframe at issue, that that plainly would be probative of his involvement in the offense."

We find no merit to this contention and hold that once again the trial judge's evidentiary ruling was correct. The proffered testimony proved nothing more than the fact that Lane had purchased a tool. Other evidence presented at trial indicated that Lane was capable of making such and would not have been dependent on receiving a large sum of money from Bratt, which sum inferentially would have been for Lane's allegedly substantial participation, rather than limited participation, in the Carback murders.

In any event, assuming arguendo that Lane had received $3,000 to $4,000 for services rendered to Bratt, that fact alone would not have exculpated the appellant. Again, we would be facing an issue of collateral impeachment. *See* discussion at IV *supra.*

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.