**Roy H. GIBSON, a/k/a Robert or Bobby Gibson, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 84–1379.

District of Columbia Court of Appeals.

Argued April 24, 1987.

Decided Dec. 9, 1987.*

* This opinion was released in typed form prior to    printing.

Jonathan L. Stern, Public Defender Service, with whom James Klein and Jennifer P. Lyman, Washington, D.C., were on the brief, for appellant.

Robertson T. Park, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell and Charles L. Hall, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MACK and BELSON, Associate Judges, and NEBEKER, Associate Judge, Retired.[**]

NEBEKER, Associate Judge, Retired:

Following a jury trial, appellant Roy Gibson was convicted of murder in the first degree while armed (felony murder), D.C. Code §§ 22–2401 (1981), –3202 (1987 Supp.); two counts of armed robbery, *id.* §§ 22–2901 (1981), –3202 (1987 Supp.); and assault with intent to commit robbery while armed, *id.* §§ 22–501 (1981), –3202 (1987 Supp.). On appeal,[1] Gibson contends the trial court abused its discretion in excluding certain expert testimony which was sought for the purpose of showing bias on the part of various government witnesses. Gibson also claims the exclusion violated his sixth amendment rights. In his second issue, Gibson argues an abuse of discretion by the trial court for its failure to strike the testimony of two government witnesses

[**] Judge Nebeker was an Associate Judge of this court at the time the case was argued. His status changed to Associate Judge, Retired, on September 1, 1987.

1. Gibson's appeal was originally consolidated with that of his codefendant Nathaniel Martin. Because of the nature of our disposition of the two appeals, an order has now been entered vacating the earlier consolidation order.

whose tape recorded telephone calls to the 911 emergency number were erased and thereby made unavailable for the purposes of the Jencks Act, 18 U.S.C. § 3500 (1982). The third issue on appeal involves the trial court's *in camera* review of a radio transmission between police dispatchers and the field units and the court's determination that the "radio run" contained no Jencks material. Gibson claims the trial court erred in its finding and he asks this court to make an independent review of the radio transmission. We affirm.

The government's evidence at trial established that on the afternoon of February 17, 1983, several armed men, including Nathaniel Martin, entered a barber shop at 1812 7th Street, Northwest, Washington, D.C. Appellant Gibson and shop owner Spurgeon Cooper, as well as a number of other persons, were already present in the shop when the armed men entered. Martin, who was wielding a gun, announced the fact of a "stickup" and ordered everyone to the rear of the shop. At the same time, Gibson displayed a knife and proceeded to take $220 from Jessup Melvin—one of the persons in the shop. As Martin directed the other people to hand over their money, shop owner Cooper stood up and moved away from where he had been ordered to remain seated. Martin shot Cooper after another of the robbers yelled for him to do so. One of the government's witnesses, Jessup Melvin, identified Gibson as the robber who exhorted Martin to shoot Cooper. After Martin fired the shot, all of the assailants fled the store.

Two of the persons who had been in the shop during the robbery called the 911 emergency number immediately after the incident. Jessup Melvin was the first to telephone the emergency number; he spoke to a police official for three to four minutes regarding the robbery and shooting. Shortly after Melvin's call, Sampson Cannon also telephoned the 911 number. He spoke to a dispatcher and related what had happened in the barber shop. After receiving the 911 calls, a dispatcher communicated, in what is known as a "radio run," to police units in the field providing information based upon that received in the telephone calls.

Gibson was identified by three of the individuals who were in Cooper's shop during the robbery and shooting. Gail Johnson identified Gibson from a photograph array that was shown to her by the police during their investigation on the evening of the crime. Johnson also testified that Gibson spoke to her two days after the robbery regarding his participation in the incident. Jessup Melvin failed to identify Gibson from the police photograph array; however, at a lineup that Melvin attended on May 4, 1983, he did point out Gibson as one of the robbers. On cross-examination, Melvin denied that an illegal numbers operation was conducted from Cooper's shop. Sampson Cannon did not view the photograph array, but at the May 4th lineup he made an identification of Gibson after hearing each of the individuals in the lineup speak a few words. Cannon was cross-examined about his 1979 arrest for possession of illegal numbers slips. He admitted to playing the numbers but denied that Cooper's shop was the scene of illegal gambling.

Gibson's defense was based on the premise that Cooper's barber shop was a front for the operation of a numbers game, and on the fact that Gibson informed the police of the operation when he was interviewed by them during the course of their investigation a few weeks after the robbery. Gibson's counsel, in an opening statement to the jury, theorized that the persons who were in the shop when the robbers entered were involved in the illegal numbers game. Furthermore, defense counsel argued that those people identified Gibson as one of the robbers in order to discredit the information he gave to police about the numbers operation, thereby reducing the chance that they would be charged with illegal gambling. Although Gibson was able to outline his defense in his opening statement and to cross-examine the government witnesses, the trial court did not allow Gibson to present expert testimony from a police detective who had been involved in a 1979 investigation of the barber shop for violations of the gambling laws.

## I

Gibson contends that the trial court abused its discretion in excluding the expert testimony that was offered to show that Cooper's barber shop had in the past been the scene of a numbers operation. The exclusion of the testimony was, Gibson claims, an erroneous evidentiary ruling as well as a violation of his sixth amendment right to present a defense and to confront the witnesses against him. We disagree.

The expert testimony that Gibson sought to have admitted was that of Detective Robert Rafferty. Drawing on his extensive experience with the Metropolitan Police Department, including over three years on the gambling and liquor squad, Rafferty, as a qualified expert in numbers gambling, would have testified as to how an illegal numbers operation is conducted. In addition, Rafferty would have given his opinion that decedent Cooper's barber shop had in the past been the site of a numbers operation.

During a *voir dire* of the detective, testimony was elicited about Rafferty's knowledge of the gambling activities which specifically took place at Cooper's shop. When Gibson's counsel examined Rafferty with respect to the extent of that knowledge, the government objected to Rafferty relying on anything more than his personal observations regarding the gambling activities. With respect to those observations, Rafferty in 1979 had assisted a Detective McClanahan in the execution of a search warrant at Cooper's and at that time concluded that Cooper was a numbers writer.[2] Since 1979, Rafferty had not been working in gambling investigations and, therefore, his knowledge of subsequent activities at Cooper's shop had come from police files, intelligence reports and informants. The trial court initially confined Rafferty's *voir dire* testimony to matters upon which he had gained knowledge through personal observation. Thus, his testimony regarding Cooper was limited to events occurring in 1979. However, as the *voir dire* continued, the detective was permitted to discuss the sources of information upon which he had relied since 1979 to form his current opinion about the ongoing gambling at Cooper's. At the conclusion of the *voir dire*, the trial court ruled that the proffered expert testimony of Rafferty's would not be admissible. The exclusion was explained in part by the fact that Rafferty's opinions about Cooper's gambling activities were based on hearsay materials and not strictly on personal knowledge and observation. The court's other reason for excluding the testimony was that it lacked relevancy.

In determining whether the trial court abused its discretion in disallowing the expert testimony, we must first review the reasons for which the testimony was sought. Counsel for Gibson was attempting to show through Rafferty's testimony that Cooper was conducting a numbers game in his barber shop. Consequently, the defense intended to establish that the people frequenting the shop were participating in the illegal gambling and thus had a motive to be both "less than honest in their testimony ... and ... to implicate Mr. Gibson, who had the knowledge of the operation [at the shop]." In essence, the testimony pertained to the bias of the government witnesses who identified Gibson as one of the robbers.

We note at the outset that the trial court's action should be viewed as raising an issue of relevancy, rather than an issue of subject matter proper for expert testimony.[3] To the extent the trial court ruled that Rafferty's opinions were inadmissible because they were based on the hearsay contained in police files and intelligence reports, the decision in *Jenkins v. United States*, 113 U.S.App.D.C. 300, 304, 307

---

**2.** Apparently, following the 1979 search of the barber shop Cooper was arrested. Cooper eventually pleaded guilty to operating an illegal lottery on the premises.

**3.** During the *voir dire* of Detective Rafferty, his qualifications as an expert on the subject of numbers gambling never became an issue. In-stead, the objections asserted by the government were directed to: (1) whether his opinion testimony could be based on information other than that received through personal observation; and (2) whether the testimony was relevant to a material issue in the case.

F.2d 637, 641 (1962), calls for a different ruling. *See L.C.D. v. District of Columbia Ex Rel. T–A.H.D.,* 488 A.2d 918, 921 n. 8. (D.C.1985); *Edwards v. United States,* 483 A.2d 682, 685 (D.C.1984); *Sponaugle v. Pre–Term, Inc.,* 411 A.2d 366, 367–68 (D.C. 1980). Notwithstanding, we understand the trial court's exclusion of the detective's testimony to be more fundamentally grounded on the lack of relevance. Specifically, the question presented to the trial court was whether Rafferty's testimony would be relevant to demonstrating that the identification of Gibson by certain government witnesses was motivated by a particular bias.

The defense may establish the bias of a witness through both cross-examination and the introduction of extrinsic evidence. *In re C.B.N.,* 499 A.2d 1215, 1218 (D.C. 1985); *see also United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984). However, the opportunity to use extrinsic evidence to explore a witness' bias is circumscribed by the rule of relevance and the discretion of the trial court to exclude evidence for a lack thereof. *McClain v. United States,* 460 A.2d 562, 569 (D.C.1983). In the instant case, the defense cross-examined the various government witnesses about the numbers game conducted by Cooper. The proffered testimony of Detective Rafferty was then intended to further establish Cooper's involvement, going back to 1979, with illegal gambling. The trial court found the testimony lacked relevance to the question of bias. We conclude that the connection between the numbers operation and witnesses' bias is too attenuated for us to rule that the trial court abused its discretion. Even if Rafferty had been permitted to testify, based on his hearsay information, that Cooper had continued to write numbers after 1979, there was still no proffered evidence connecting those gambling activities to the witnesses who were in the shop in February 1983. During his *voir dire* testimony, Rafferty did not tie any of the witnesses who identified Gibson to the post–1979 illegal activity supposedly engaged in by Cooper. Thus, considering the tenuous nature of the link between the identifying witnesses and Cooper's illicit conduct (as would have been established by the proffered testimony), the trial court's determination that the testimony lacked relevance to the question of the witnesses' bias was not an abuse of discretion.

The exclusion of the testimony was based on the fundamental evidentiary rule of relevance. Equally fundamental is an accused's right "to confront and cross-examine witnesses and to call witnesses in one's own behalf." *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). Moreover, "the Confrontation Clause of the Sixth Amendment requires a defendant to have some opportunity to show bias on the part of a prosecution witness." *United States v. Abel, supra,* 469 U.S. at 50, 105 S.Ct. at 468; *see also Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In the instant case, Gibson claims the court's decision to exclude the testimonial evidence violated his constitutional rights. We view it otherwise. The trial court found that use of the testimonial evidence would violate the rule requiring evidence to be relevant. "[T]he accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers, supra,* 410 U.S. at 302, 93 S.Ct. at 1049; *Ready v. United States,* 445 A.2d 982, 990 (D.C.1982), *cert. denied,* 460 U.S. 1025, 103 S.Ct. 1279, 75 L.Ed.2d 498 (1983). There is no constitutional right to present irrelevant evidence. We hold that under the facts and circumstances of this case the exclusion of the testimony was not error.

## II

■ In his second issue on appeal, Gibson claims that the trial court abused its discretion by not imposing sanctions on the government for the failure to preserve the tape recordings of Jessup Melvin's and Sampson Cannon's telephone calls to the 911 emergency number. Although the trial judge determined that the police department had erased the two tape recordings, in violation of the government's duty under

the Jencks Act, 18 U.S.C. § 3500 (1982), Gibson's motions to strike the testimony of the two witnesses were denied. *See Montgomery v. United States*, 384 A.2d 655, 661 (D.C.1978) (government has the duty to preserve statements of witnesses covered by the Jencks Act). Gibson now contends, as was requested at trial, that a hearing should have been conducted into the circumstances surrounding the erasure of the recordings. Furthermore, it is asserted, the failure to preserve the recordings was in conscious disregard of this court's decisions urging the police department to take measures to preserve discoverable evidence. *Marshall v. United States*, 340 A.2d 805, 809 (D.C.1975). Thus, Gibson argues that the witnesses' testimony should have been stricken and failure to do so was an abuse of discretion. We disagree.

After Sampson Cannon testified for the government, Gibson requested the tape recording of Cannon's telephone call to the 911 emergency number. Once it was learned from the government that the recording had not been preserved, Gibson requested that Cannon's testimony be stricken, or, in the alternative, that the court conduct a hearing to determine the circumstances under which the tape had been erased. The inquiry engaged in by the trial court involved a colloquy with the prosecutor and defense counsel.

The trial court then made a finding that the recording had been erased "pursuant to policy and practice which existed in the police department" and because of cost considerations within the communications division of the police department. The court stated that the department's policy, which showed a lack of consideration for a defendant's rights under the Jencks Act, had now changed so that "such tapes are preserved for a substantially longer period of time than the tape in the [instant] case." The court went on to state that based on the testimony of Cannon, it was credible that his 911 telephone call did not contain any information about the descriptions of the assailants. Consequently, the court declared, the recording would have contained "little" Jencks material. In addition, the

court noted that a police report (a PD 251) was available and that it contained information supplied by Cannon which contradicted his trial testimony. This police report could serve as a cross-examination tool and would allow the jury to assess Cannon's credibility. The court concluded by finding that consequences of the Jencks violation were so "insignificant" to Gibson that the government's failure to produce the recording did not warrant the striking of Cannon's testimony.

After Jessup Melvin's testimony, Gibson requested the tape recording of that witness' 911 call. It too had been erased, thus causing Gibson to renew his demand for a hearing on the reasons for the government's failure to preserve the recording. There was also a request to strike Melvin's testimony. Unlike in the case of Cannon's telephone call, the government was able to furnish Gibson with a computer printout which contained some of the information which the 911 operator received during the course of Melvin's call. The trial court ruled that the printout served as an "adequate source" of the substance of Melvin's call to the 911 number. Furthermore, the court perceived no "specific prejudice" to Gibson as a consequence of the government's failure to produce the tape recording. As a result, the court denied the motion to strike Melvin's testimony.

With respect to the nature of the inquiry conducted once the government indicated the recordings were erased, we conclude that the trial court acted within its discretion. During its inquiry the court was informed by the prosecutor that the tapes were erased pursuant to departmental policy. There were no indications that failure to preserve the recordings was the result of bad faith. Nor were the tapes that were pertinent to this case singled out for erasure—a situation which would certainly have necessitated a hearing similar to that outlined in *United States v. Jackson*, 450 A.2d 419, 426 (D.C.1982). Rather, the erasure of the recordings in the instant case happened similarly to the way it occurred in *Bartley v. United States*, 530 A.2d 692 (D.C.1987). By ascertaining that the re-

cordings were lost due to an administrative practice and not because of circumstances unique to this case, the trial court was then justified in conducting a more limited inquiry.

The next question is whether the trial court, as Gibson contends, abused its discretion by refusing to impose sanctions on the government for its failure to preserve the recordings. We have recently reiterated that "[a] finding of improper destruction ... does not require that sanctions automatically be imposed." *Bartley, supra,* 530 A.2d 697. *Accord, Cotton v. United States,* 388 A.2d 865, 870 (D.C. 1978). The trial court is to consider all the circumstances when it determines whether to apply sanctions. *Bartley, supra,* 530 A.2d at 697. One of the sanctions available is to strike a witness' testimony. In deciding whether to exercise this option, the trial court's discretion should be guided by "(1) the degree of negligence or bad faith involved, (2) the importance of the evidence lost, and (3) the evidence of guilt adduced at trial." *Id. Accord, United States v. Bryant,* 142 U.S.App.D.C. 132, 143, 439 F.2d 642, 653 (1971).

As previously stated, the trial court found that the recordings were erased in accordance with a police department policy which called for reuse of the tapes. As in *Bartley,* there was "nothing in the record to suggest that the erasure of the tape was the result of either bad faith or a desire to conceal or destroy evidence." 530 A.2d at 697. Moreover, the trial court concluded that the recording of Cannon's telephone call did not contain statements relating to the subject matter of his testimony. With respect to Melvin's call, the fact that a computer printout existed which contained information conveyed over the telephone was a consideration in the trial court's decision not to strike the testimony. *See Moore v. United States,* 353 A.2d 16, 18 ("Documents which substantially incorporate notes or records of oral statements of a witness may satisfy the production re-

quirements of the [Jencks] Act depending on the reliability of the reporting process and the absence of prejudice to the defendant.") (footnote omitted), *aff'd after remand,* 363 A.2d 288 (D.C.1976). It was also determined that the loss of the two recordings had not caused substantial prejudice to Gibson. Finally, the availability of the PD 251, which was prepared subsequent to a police interview with Cannon, gave the defense a basis upon which to cross-examine the witness.

We are convinced that the evidence of guilt adduced at trial was such that neither the failure of the government to produce the tape recordings nor the court's refusal to impose Jencks sanctions resulted in a miscarriage of justice. We therefore conclude that the trial court did not abuse its discretion in denying Gibson's motions to strike the testimony of both Cannon and Melvin.

### III

The final contention on appeal involves the radio transmissions ("radio run") to the police field units from the dispatchers who received Sampson Cannon's and Jessup Melvin's 911 emergency calls.[4] At trial Gibson moved, pursuant to the Jencks Act,[5] for production of the recording of the radio run on the grounds that the tape contained statements related to the testimony of Cannon and Melvin. The trial court reviewed the tape of the radio run *in camera* and determined that it contained no Jencks material. Gibson contends that the trial court erred in its ruling and he requests that we make an independent review of the tape.

Contrary to the representations made by the government at trial that the tape would remain in its files and thus be available for appellate review, we are advised that the recording no longer exists. This carelessness forces this court to make an evaluation of the likely nature of the words on the tape and the practical effect the tape

---

**4.** It is not clear whether the dispatcher who receives the 911 calls is the same one who then radios the information to police units in the field.

**5.** 18 U.S.C. § 3500 (1982).

could have had at the trial. This evaluation must be made in light of the alternative. A new trial could be ordered, but because of the loss of the tape, Cannon's and Melvin's testimony would not be available at that trial on the theory that their "statements" were not produced.

We reject an automatic reversal as a just and practical form of appellate relief. We do so because it is highly unlikely that the tape of the radio run—like the 911 calls—would contain anything in the nature of impeaching material. The 911 calls and the prompted radio run most certainly were simply a report of the killing and a request for a street police unit to respond to the scene and investigate. Neither communication likely produced a description of the perpetrator or the event in sufficient detail, if detailed at all, to be a Jencks statement. Thus, the trial judge's finding that the tape contained no impeaching statement of Cannon or Melvin seems presumptively correct. Reversal of the conviction would be therefore an unwarranted speculation of error. Benjamin Franklin's maxim, borrowed in part from George Herbert's *Jacula Prudentum,* is apropos to our view of the government's loss of the radio run.

A little neglect may breed mischief: for want of a nail the shoe was lost; for want of a shoe the horse was lost; and for want of a horse the rider was lost.

B. Franklin, *Poor Richard's Almanac* (1757). We are concerned that we cannot review the radio run; however, at the same time we do not believe the missing tape should become the "nail" which results in the reversal of Gibson's conviction.

The tape was reviewed twice by the trial court with regard to whether there were producible statements under the Jencks Act. The first review was based on Cannon's testimony and the second was based on Melvin's. On both occasions the court found no Jencks material. Furthermore, after the second review, the court reiterated that "indeed there is nothing on [the] tape that could really be considered Jencks material with respect to any specific witness."

It is also necessary that we consider the nature of a radio run and the fact that it is a transmission from the dispatcher to the police units. For the transmission to qualify as a "statement," under the terms of the Jencks Act,[6] by the person who telephoned the dispatcher, the communication to the police unit would have to be a "continuous, narrative recording rather than mere selective notations or excerpts from the oral statements." *Moore, supra,* 353 A.2d at 18 (footnote omitted). We believe the typical radio run would not fall within this definition.[7] Therefore, at most, the recording would only have been a secondary source of Jencks material.

Finally, with respect to Cannon, the police at the scene of the robbery completed a PD 251 report a short time after the criminal event.[8] This report contains information which Cannon provided to police regarding the circumstances of the crime. Included in the report were descriptions of the assailants. The PD 251 was available to defense counsel for the purpose of cross-examining Cannon and as a basis for impeachment. We recognize that the police report is a separate source of Jencks material. However, it is also a record of statements made by the witness close to the

6. 18 U.S.C. § 3500(e) provides:
The term "statement," as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—
(1) a written statement made by said witness and signed or otherwise adopted or approved by him;
(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or....

7. If, as discussed in note 4, *supra,* the dispatchers who receive the 911 calls are separate from those making the radio transmissions, then the link between the original statement and its recording or recital become that much more attenuated. The result is that the radio run's use as Jencks material would be less likely.

8. There is some question from the record as to whether a PD 251 was prepared after the police interviewed witness Melvin.

time that the radio run would have perhaps provided another record. For this reason, under the circumstances of the instant case, we believe the PD 251 serves as a *substitute* source of Cannon's statements at and around the time of his 911 call and the subsequent radio transmission.

Regrettable as it may be that the 911 call and the radio transmission are not available for our review, the foregoing considerations lead us to conclude that the ends of justice have not been compromised, nor has an innocent man been convicted. Thus, we hold there is not an adequate basis for reversal.

Accordingly, the judgment of conviction is

*Affirmed.*

MACK, Associate Judge, concurring in the result only:

On this record, the government's conduct does not rise to the level of gross negligence and therefore the trial court's refusal to strike the witness' testimony is not an abuse of discretion.